MISSOURI, KANSAS & TEXAS RAILWAY COMPANY OF TEXAS V.
IDA MITCHELL.

Decided October 26, 1907.

**Passenger—Ejection from Train—Excessive Verdict.**

In a suit for damages by a minor female passenger for wrongful ejection from a railroad train, evidence considered, and held that a verdict for $1,000 was excessive, and a remittitur of $900 required.

Appeal from the District Court of Denton County.   Tried below before Hon. D. E. Barrett.

*Garnett & Eldridge,* for appellant.

No brief for appellee.

SPEER, ASSOCIATE JUSTICE.—Ida Mitchell by her father as next friend instituted this suit against the Missouri, Kansas & Texas Railway Company of Texas to recover damages for having been unlawfully ejected from defendant's train, and from a verdict and judgment in her favor in the sum of one thousand dollars the defendant has appealed.

Appellee, who lived with her father at Collinsville, purchased a ticket over appellant's line from that place to Denton on November 10, 1905. The agent who sold her the ticket through mistake punched the margin of the same in such way as to make its time limit expire on November 10 instead of November 20.   On November 12 she boarded defendant's train at Denton to return to her home, but was told by the auditor that her ticket was of no value, that it had expired, and that she would have to pay her fare or get off at the next station. Not having the money with which to pay her fare, she did get off at the next station and remained until a later hour in the day, when she took another train home.   The evidence, more of which will be set out in the opinion hereafter, amply raised the issue and supported the jury's finding that appellant's employees wrongfully ejected appellee, though they were not actually present at the time she alighted, and though they never at any time used any physical violence toward her.   The uncontroverted evidence also justified the court in assuming in his charge to the jury that appellee was entitled to ride on defendant's train from Denton to Collinsville on her return trip on November 12.   This disposes of all assignments save the one complaining of the excessiveness of the verdict, which we must sustain, unless appellee shall within twenty days enter a remittitur in the sum of nine hundred dollars, in which event the judgment for one hundred dollars will be affirmed.   Missouri, K. & T. Ry. Co. of Texas v. Snider, 33 S. W. Rep., 557; Gulf, Colo. & Santa Fe Ry. Co. v. Ryan, 18 S. W. Rep., 866; Texas & P. Ry. Co. v. Dennis, 4 Texas Civ. App., 94; Missouri, K. & T. Ry. Co. of Texas v. Ball, 61 S. W. Rep., 327.

The evidence pertinent to the issue of damages was given mainly

by the appellee herself, and is as follows: "I started back home on Sunday, which was the third day after I got on the train. After I got on the train, which was a passenger train, the auditor came around taking up the tickets. When he came to me I handed him my ticket and he looked at it and shook his head and said it was not good. He spoke in rather crabbed tone. I told him I bought the ticket on Friday evening and was going back that evening, and he said, 'You can see it is no good and you will have to get off at the next station.' I did not have money with me to pay my fare. The next station we got to was Mingo; the auditor stayed there and talked with me until about the time the train whistled for Mingo; then he turned back to the back of the car I suppose. His manner and talk frightened me, and when I got to Mingo I got off. The porter, I suppose it was, helped me off, and I asked him where I could get a phone to phone to papa to get money to get back home on, and he called Mr. Archer to him and Mr. Archer took me to the phone and I phoned papa. I was not acquainted with anyone in Mingo and had never been there before. . . . I got off at Mingo because the auditor told me to. . . . I got off because I thought I had to; I thought he, the auditor, would put me off if I didn't. . . . When the auditor was talking to me, and when I got off there were about thirty or forty people in the car. The attention of some of the people was attracted by the auditor, some of them looked at me and I felt ashamed and was scared nearly to death. Mr. Archer was there at the train when I got off; he was a stranger to me; I had never seen him before, or heard of him. He treated me kindly, as nice as anyone could have treated me. Mr. Archer loaned me money to get home on, and I got away from Mingo about 10:30 or near 11, I suppose, that night. When I got home I was so weak I could hardly walk home; I was scared the way I had been treated. When I got off at Mingo the auditor did not try to help me off, he turned and walked off from me. None of the trainmen paid any attention to me at all when I was getting off but the porter, and he was a negro. . . ." On cross-examination she testified: "I do not know what time it was when I left Denton Sunday evening; it was two something, I believe, when the train left Denton; I know it was tolerably early after dinner when I left. If I could have gone on I would have reached Collinsville at five o'clock. When the auditor came to me I handed him my ticket and he said it was no good; he turned the ticket over and looked at it and said it wasn't good; he said it was punched wrong, I believe; no, he said it was out of date, that is what he said. I told him I bought my ticket on Friday, and he said, 'You can see that it is not good, and you will have to get off at the next station.' Then he motioned for the conductor, or at least I suppose it was the conductor, it looked like him, and said something to him, and he then came back and told me I would have to get off. . . . The porter on the train helped me off and called Mr. Archer, and he came to me and took me up to his house. Mr. Archer's house is about one hundred yards from the track, I suppose, where I got off of the train. I remained at Mr. Archer's until I went home on

the other train—that is, the Dallas Fair train. I ate supper at Mr. Archer's house; he is a man of family; he has four girls and I believe he has two boys; I am not certain; I don't know just how many in family, but I know there is that many. Mrs. Archer was there; her oldest girl was a little older than me, and the other girls were younger than I was. I do not know how old the boys were. While I was at their home they treated me kindly, talked kindly to me and treated me as well as you could expect. I phoned to papa and told him where I was. Mr. Archer and his oldest daughter went to the train with me when I started home. There was no one with me as I was going home; when I got there my father and three brothers and my brother's wife met me at the station and I went from there home. My home was about two hundred yards from the station. It was very near twelve when I got home. I had as nice a time at Mr. Archer's as one would expect to have; they made everything as pleasant as they could. We had music there; Mr. Archer's daughter played on the piano; I did not play any; I have never learned to play; I did not sing any; I can not sing much. . . . The way he (the auditor) talked to me did not make me angry, but it frightened me awfully bad. I never was treated that way before, and it hurt my feelings. I was afraid of the way he talked. I never was treated that way by a man before and I did not know what to do. I was afraid he was going to put me off; I thought by his way and manner he would. He told me three times that I would have to get off at the next station. When they stopped at the station, or just as they were stopping, he turned and walked off and never came back any more. When I got off, I got off by myself, voluntarily. He never said anything more; I just got off." The testimony further showed that appellee's uncle and aunt were on the train and accompanied her on her return as far as Pilot Point, and from that place home she was in the company of Honorable Alvin C. Owsley, of Denton. The uncle testified that appellee "seemed to be very much frightened and nervous and excited."

We have thus set out that portion of the record which most strongly supports appellee's cause, and without unnecessary comment we hold that same does not authorize the verdict in the sum mentioned, and hence require the remittitur above suggested.

*Remittitur required and affirmed.*